IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL STINEBAUGH,           :        No.  4:06-cv-2210
LINDA MCCAULEY, and           :
BRUCE HANN,                   :        Judge John E. Jones III
                Plaintiffs,   :
                              :
        v.                    :
                              :
ELDORADO STONE, LLC,          :
                Defendant     :

## MEMORANDUM

January 11, 2008

Plaintiffs Michael Stinebaugh, Linda McCauley, and Bruce Hann bring this so-called "reverse discrimination" action against their former employer, Defendant Eldorado Stone, LLC ("Eldorado"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* ("PHRA"), arising out of discrimination based on race and national origin.  Before the Court are Eldorado's motions for summary judgment against each of the individual plaintiffs.  (Docs. 30, 32, and 34.)  For the reasons that follow, the motions will be granted.

# I.    BACKGROUND

"If a man walks in the woods for love of them half of each day, he is in

danger of being regarded as a loafer.  But if he spends his days as a speculator,

shearing off those woods and making the earth bald before her time, he is deemed

an industrious and enterprising citizen."  Henry David Thoreau, *Life without*

*Principle* (1863).  The parties and their counsel may certainly be deemed

industrious and enterprising speculators, as the thousands of pages submitted in

support of and opposition to the present motions have undoubtedly left a bald spot

in some woods.[1]  Pursuant to the requirement of Local Rule 56.1 that a motion for

summary judgment be accompanied by a "short and concise statement" of material

facts, Defendant submitted 279 paragraphs of purportedly material facts over 37

pages.  The Plaintiffs' "short and concise statement" responds with 60 pages of

purported disputes.  In almost 100 pages of all-too-frequently immaterial facts and

non-genuine disputes, the parties have lost the forest for the trees.  What follows is

the Court's attempt to prune from the disjointed and unnecessarily voluminous

record the undisputed facts material to the present motions.

In accordance with the standard of review governing motions for summary

---

[1] *But cf.* John Muir, *Our National Parks* (1901) ("God has cared for these trees, saved them from drought, disease, avalanches, and a thousand tempests and floods.  But he cannot save them from fools.").

judgment, the following facts, and any reasonable inferences derived therefrom, are viewed in favor of the non-moving parties, the Plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, because a non-moving party may not rely on unsupported allegations to prevent summary judgment, *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000), the Court has interpreted a fact in the Plaintiffs' favor only where they have pointed to evidence beyond the pleadings that establishes at least a genuine dispute as to that fact.

### A.     The Plaintiffs' Employment

The Plaintiffs are white, non-Hispanic former employees of Eldorado, who allege that Eldorado discriminated against them by treating them less favorably than Hispanic co-workers on the basis of their race and national origin.[2]  Eldorado, formerly known as L&S Stone, manufactures architectural stone veneer.  (Def.'s Statement of Undisputed Material Facts ["SUF"] ¶ 1.)  Eldorado operates a facility in Greencastle, Pennsylvania, which consists of two physical plants, the "North

---

[2] Plaintiffs describe themselves as "Caucasian Americans of United States ancestry" and variously describe the allegedly favored class of employees as Hispanics, Latinos, or Mexicans. While the federal government classifies "white" as a race, "Hispanic" is an ethnicity encompassing "person[s] of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin, *regardless of race*."  OMB Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 36874, 36943 (July 9, 1997) (emphasis added).  Plaintiffs' claims are thus properly raised under Title VII's prohibition against discrimination based on national origin, not race.  The Court will refer to the Plaintiffs as non-Hispanic employees and the allegedly favored class as Hispanic employees.

Plant" and the "South Plant."  (SUF ¶ 2.)

Plaintiff Michael Stinebaugh began working at Eldorado in 1997 through a temporary employment agency.  (SUF ¶ 28; Stinebaugh Dep. at 12.)  A little over a year later, Stinebaugh was hired permanently as a tinter in the North Plant.  (SUF ¶¶ 29, 31.)  A tinter is a production, or "direct labor", position that paints colors and designs on stone molds.  (SUF ¶ 32; Hartmire Dep. at 36; Brisson Dep. at 121-22.)  Stinebaugh eventually worked as a mixer operator, another direct labor position, in the North Plant.  (Stinebaugh Dep. at 42.)  In the summer of 2005, a position opened up in quality control in the North Plant.  (*Id.* at 69-70.)  Stinebaugh and others, including at least one Hispanic employee, applied for the position.  (*Id.*)  After being interviewed, Stinebaugh was given the position.  (*Id.* at 70.)  Stinebaugh began working in quality control, a non-production or "indirect labor" position, on December 6, 2005.  (*Id.* at 41-42.)  Eldorado terminated Stinebaugh's employment on January 3, 2006.  (SUF ¶ 43.)

Plaintiff Linda McCauley began working at Eldorado in January 2003 through a temporary employment agency.  (SUF ¶ 5.)  McCauley was the only administrative employee at the North Plant.  (SUF ¶ 6.)  She assisted with scheduling, payroll, human resources paperwork, inventory, and supply purchasing; answered phones; and provided administrative and clerical support.

4

(SUF ¶ 8; McCauley Dep. at 21-23-25; Sites Dep. at 17-19, 31; Strine Dep. at 39; Samuel Moreno Dep. at 14.)  McCauley's position was an indirect labor position. (Brisson Dep. at 15-16; Coughlin Dep. at 43-44.)  Eldorado terminated McCauley's employment on January 3, 2006.  (SUF ¶ 24.)

Plaintiff Bruce Hann began working at Eldorado in 1998 through a temporary employment agency.  (SUF ¶ 46.)  In May 1999, he was hired permanently as a stone puller in the South Plant.  (SUF ¶¶ 47, 49.)  A stone puller is a direct labor position that removes stone from molds when it is dried.  (SUF ¶ 48.)  Hann eventually worked as a mixer operator, another direct labor position, in the South Plant.  (SUF ¶ 53; Hann Dep. at 16.)  In 2003, Hann was transferred to the North Plant when the machine he operated was moved there.  (SUF ¶¶ 49-50, Hann Dep. at 13-14.)  At the North Plant, Hann operated the mixer and a paver-making machine and also drove a forklift, all direct labor positions.  (SUF ¶ 54.) In approximately December 2005, Hann was given the position of mold supervisor, an indirect labor position.  (Hann Dep. at 17.)  Eldorado terminated Hann's employment on January 3, 2006.  ("Termed Employee List", Doc. 37-16.)

**B.      Allegations of Discrimination**

Plaintiffs allege several examples of discriminatory and disparate treatment,

which fall into the following categories:

**1.      Termination**

Plaintiffs' primary allegation of discrimination (and the only one addressed

in their briefs opposing summary judgment) is that Eldorado, under the guise of

closing the North Plant and eliminating certain positions, terminated the non-

Hispanic Plaintiffs and then filled their positions with Hispanic employees.  (*See*

Compl. ¶¶ 14(a)-(c), (m).)

As noted above, Eldorado's Greencastle facility consisted of two physical

plants, the "North Plant" and the "South Plant."  (SUF ¶ 2.)  The two plants are

located in close proximity to each other.  (Brisson Dep. at 15.)  Michael Coughlin

was the manager of the Greencastle facility.  (SUF ¶ 67; Coughlin Dep. at 10-11.)

Coughlin is white and non-Hispanic.  (SUF ¶ 66.)  At the time Coughlin took over

as manager, the Greencastle operation had high costs and was unprofitable.[3]  (SUF

¶ 72; Coughlin Dep. 17-18; Brisson Dep. 63-65.)  In the fall of 2005, after

Coughlin became manager, Eldorado management directed him to reduce costs and

---

[3] Plaintiffs attempt to dispute this fact, pointing to evidence that workers at the North Plant were busy and that bonuses were given to employees in 2005.  The very fact that so many workers were being paid so much, however, is what caused the high costs and unprofitability. (*See* Coughlin Dep. at 19; Brisson Dep. at 64-65.)

6

labor.  (SUF ¶ 76; Coughlin Dep. at 18, 41; Brisson Dep. at 13-14, 70.)

To accomplish these objectives, the decision was made to close the North Plant.  (SUF ¶ 70; Coughlin Dep. at 17-18; Brisson Dep. at 13.)  Coughlin made this decision because, unlike other Eldorado facilities which have only one plant and one set of employees, the Greencastle facility had duplicative sets of employees in the North and South Plants.  (SUF ¶ 73; Coughlin Dep. at 17-18.) Coughlin planned to close the North Plant, consolidate production in the South Plant, and also downsize the workforce in the South Plant.  (SUF ¶¶ 79, 88; Coughlin Dep. at 18; Brisson Dep. at 13-14.)  Because the company still had existing orders for products made at the North Plant, and to allow time to train South Plant employees who would be retained how to manufacture these products, the North Plant was to be phased out over a period of time, rather than closed abruptly.  (SUF ¶¶ 119-120; Brisson Dep. at 14-15.)

Coughlin, in consultation with Director of Human Resources Cheryl Brisson, determined who would be terminated and in what order.  (SUF ¶¶ 81, 94, 108; Coughlin Dep. at 18, 43; Brisson Dep. at 25-26.)  Administrative and indirect labor positions in the North Plant were eliminated first.  (Coughlin Dep. at 43.) These positions were eliminated first because they were pure cost positions, not directly tied to production.  (SUF ¶ 97; Brisson Dep. at 16.)  In addition,

employees in the South Plant were already performing these indirect labor functions.  (SUF ¶ 97; Coughlin Dep. at 44; Brisson Dep. at 16.)

The first terminations occurred on January 3 and 4, 2006, at which time Stinebaugh, McCauley, and Hann were terminated along with nine other employees.  (SUF ¶¶ 24, 43; Termed Employee List;  EEOC Request for Information ["EEOC RFI"], Doc. 37-17 at 2.)  Of the twelve employees terminated at that time, five are Hispanic and seven are non-Hispanic.[4]  (SUF ¶ 133; Termed Employee List; EEOC RFI at 2; Brisson Dep. at 30; Coughlin Dep. at 19-20.)  The terminated employees were told their positions were being eliminated.  (SUF ¶¶ 135, 138; Brisson Dep. 66-68; Coughlin Dep. at 50-51; EEOC RFI at 2.)  Although Eldorado had already made the decision to close the North Plant, the terminated employees were not told of this decision to avoid a premature and mass exodus of employees.  (SUF ¶ 130; Coughlin Dep. at 61-62; Brisson Dep. at 29.)

---

[4] Plaintiffs claim that only white, non-Hispanic employees were terminated at this time. This claim is based solely on Stinebaugh's mistaken belief that only four employees were terminated and that all of them were non-Hispanic.  (Stinebaugh Dep. at 51-53.)  This allegation is entirely unsupported and, in fact, is contradicted by undisputed evidence.

Over the next few months, Eldorado closed the North Plant.[5]  The number of North Plant employees was reduced via attrition, transfer, and termination.  (SUF ¶¶ 106, 124-25; Brisson Dep. at 26-28; Coughlin Dep. at 20, 63.)  Both Hispanic and non-Hispanic employees were transferred to other Eldorado facilities.  (SUF ¶¶ 102, 124; Brisson Dep. at 27.)  About 90-95% of the employees terminated because of the North Plant closure were Hispanic.  (Brisson Dep. at 26-27; Coughlin Dep. at 19-20.)  At the same time, employees from the South Plant temporarily worked at the North Plant to learn the production processes performed there, which would eventually be performed only in the South Plant.  (SUF ¶¶ 102, 126-28; Brisson Dep. at 28; Coughlin Dep. at 63.)  Production at the North Plant ceased by September 2006.  (Brisson Dep. at 123; Coughlin Dep. at 62.)  The North Plant facility is now used only as a warehouse.  (Stinebaugh Dep. at 53, 55-56; McCauley Dep. at 173; Hann Dep. at 24).

Despite the closure of the North Plant, the Plaintiffs allege that they were "replaced" by Hispanic employees after their termination.  (Compl. ¶ 14(b).)

---

[5] Plaintiffs squander an inordinate amount of effort attempting to dispute that the North Plant closed, going so far as to speculate"[m]aybe it didn't close."  (Doc. 42 at 35.)  This unsubstantiated speculation is entirely incredible in the face of the Plaintiffs' own sworn testimony that production work no longer occurs at the North Plant. (Stinebaugh Dep. at 53, 55-56; McCauley Dep. at 173; Hann Dep. at 24).  It is undisputed that no production takes place at the North Plant.  It is undisputed that no employees at the North Plant perform the functions that the Plaintiffs previously performed there.  The North Plant is closed.

Stinebaugh states that in the summer of 2006, before production ceased at the North Plant, he visited the facility and observed Sibia Moreno, a Hispanic employee, testing batches of cement, which was one of his former responsibilities in quality control.[6]  (Stinebaugh Dep. at 58-60.)  After Stinebaugh was terminated, Eldorado's quality control manager, Edvin Arana, managed quality control at the North Plant until it closed, using remaining employees from both plants. (Coughlin Dep. at 44, 76-77; Samuel Moreno Dep. at 62-63.)  Sibia Moreno was one of the remaining employees that assisted with quality control after Stinebaugh was terminated.  (Sibia Moreno Dep. at 10.)

McCauley stated that she was told by another former employee that "a Hispanic gentlemen from Oil City or Washington, D.C." was seen in her office at the North Plant doing her former job.  (McCauley Dep. at 171-72, 184-85.) McCauley did not know whether this individual also performed other duties.  (*Id.* at 185.)  Samuel Moreno, a Hispanic employee and the production supervisor at the North Plant, performed the scheduling aspect of McCauley's former position after her termination.[7]  (Samuel Moreno Dep. at 58.)

---

[6] Sibia Moreno is sometimes mistakenly referred to in testimony as "Sylvia"or "Silvia".

[7] Samuel Moreno is sometimes mistakenly referred to in testimony as "Sam Well" or "Mr. Marino".

10

Hann stated that in March 2006, before the closure of the North Plant, he visited the facility and observed an unidentified Hispanic man performing his former position of mold supervisor.  (Hann Dep. at 26-28.)

Eldorado contends that the Plaintiffs' duties were temporarily performed by other employees during the winding down of the North Plant, and that no one filled the Plaintiffs' positions after the closure of the plant.  (SUF ¶ 93; Coughlin Dep. at 17-19, 29.)

## 2.    Communicating in Spanish

Plaintiffs also allege that Eldorado discriminated against them by conducting meetings entirely in Spanish and posting memos and job openings only in Spanish. (Compl. ¶ 14(e)-(g).)  Plaintiffs testify that numerous meetings were conducted entirely in Spanish, and that they did not understand what was being said at such meetings.  (Stinebaugh Dep. at 67-68; McCauley Dep. at 106; Hann Dep. at 20-21.)  Stinebaugh and Hann also saw numerous memos in Spanish posted on a bulletin board.  (Stinebaugh Dep. at 71-74; Hann Dep. at 30-32.)  Hann also alleges that on one occasion he saw a job opening for a forklift position posted only in Spanish.  (Hann Dep. at 32.)

Eldorado contends that Coughlin attended all management meetings, and these meetings were all conducted in English with Spanish translation.  (SUF ¶

147; Coughlin Dep. at 22-23.)  The quality control manager for the North Plant,

Darron Carr, conducted meetings for quality control personnel in English.  (SUF ¶

151.)  Samuel Moreno would sometimes speak to Hispanic production employees

only in Spanish and hold meetings concerning only Hispanic production

employees   entirely in Spanish.  (SUF ¶ 148; Coughlin Dep. at 23-24; Samuel

Moreno Dep. at 18-19.)  If a meeting concerned only production supervisors or

employees, the Plaintiffs, in their administrative and indirect labor positions, would

have had no reason to attend.  (SUF ¶ 149.)

Eldorado further contends that, while notes or e-mails between two Hispanic

employees may have been only in Spanish, all public notices and job postings were

in both English and Spanish because the company had employees who understood

only one language or the other.  (Coughlin Dep. at 26-27, 30; Samuel Moreno Dep.

at 25-26, 32-33.)

### 3.    Training

McCauley also claims that she was denied training opportunities which were

provided to Hispanic employees.  (*See* Compl. ¶ 14(h), (k), (l).)  English language

classes were made available to Hispanic employees after business hours through a

state grant program.  (SUF ¶¶ 167-68, 176-78.)  Hispanic employees were not paid

for attending the English classes nor excused from work to do so.  (SUF ¶ 169.)

McCauley indicated to Brisson that she wanted to learn Spanish.  (McCauley Dep. at 128.)  Brisson informed McCauley that if she found a Spanish class to take, Eldorado would pay for it.  (SUF ¶ 170.)  McCauley found two classes and brought them to Brisson's attention, but Brisson indicated that the classes were too expensive.[8]  (McCauley Dep. at 136).  Eldorado has, however, paid for several other non-Hispanic employees to take Spanish classes.  (SUF ¶¶ 172-74; Brisson Dep. at 24-25.)

McCauley also alleges that she was denied fire extinguisher training that was provided to Hispanic employees.  (Compl. ¶ 14(l).)  Fire extinguisher training was provided to production supervisors.  (SUF ¶ 160; Coughlin Dep. at 31.)  Both Hispanic and non-Hispanic employees received fire extinguisher training based on the nature of their jobs.  (SUF ¶ 163; Fickes Dep. at 15-16.)  McCauley also wanted this training (McCauley Dep. at 129-30), but was denied because her job did not require it (Coughlin Dep. at 31-32.)  No other administrative employee received fire extinguisher training.  (SUF ¶ 164; Coughlin Dep. at 32.)

---

[8] Brisson disputes that McCauley ever brought the classes to her attention (SUF ¶ 171) and does not recall telling McCauley that a class was too expensive (Brisson Dep. at 24).  On this summary judgment motion, however, this fact must be viewed in the light most favorable to the non-moving party, McCauley.

McCauley also alleges that she was denied forklift training because her job responsibilities did not require it, although a Hispanic employee whose job also allegedly did not require such training was provided it. (*See* Compl. ¶ 14(h).) Although it was not part of her job, McCauley requested forklift training, but was denied. (McCauley Dep. at 204-05.) Sibia Moreno, a Hispanic employee, worked in direct labor positions as a tinter and assistant to the mixer operators.[9] (Sibia Moreno Dep. at 8, 12.) Moreno was provided forklift training. (McCauley Dep. at 205; Sibia Moreno Dep. at 8-9.)

### 4. Hiring

The Plaintiffs also claim that Eldorado hired Hispanic individuals who were referred to the company by other employees but not non-Hispanics who applied for positions at Eldorado at the urging of the Plaintiffs. (Compl. ¶ 14(d).) McCauley encouraged two non-Hispanics to apply for positions at Eldorado, and neither were hired, although McCauley does not know why or what happened after they applied. (McCauley Dep. at 182.) Stinebaugh encouraged his brother to apply for a position, but he was never called for an interview. (Stinebaugh Dep. at 63-64.) Samuel Moreno, however, referred Hispanic applicants to Coughlin, and these

---

[9] McCauley refers to Sibia Moreno as "the cleaning person" (McCauley Dep. at 205), but also admits that she worked as a tinter (*id.* at 205-06). Other evidence, including Sibia Moreno's own testimony, confirms that she worked on the production floor in a direct labor position. (Sibia Moreno Dep. at 8-9, 12; SUF ¶ 101; Coughlin Dep. at 45.)

applicants were often hired.  (Samuel Moreno Dep. at 41, 43; McCauley Dep. at 140, 183-84.)

Eldorado maintains that it does not seek Hispanic workers over non-Hispanic workers.  (SUF ¶¶ 156, 181, 190-91; Coughlin Dep. at 30, 89; Brisson Dep. at 45, 51-52.)  Coughlin and Brisson are non-Hispanic, and three of the eight current supervisory positions at the Greencastle facility are held by non-Hispanics.  (SUF ¶¶ 66, 179, 209; Coughlin Dep. at 11-12, 92-94; Brisson Dep. at 26; Strine Dep. at 45; Cortes Dep. at 81.)

### 5.    Undocumented Workers

Finally, the Plaintiffs allege that Eldorado discriminated against them by fraudulently helping obtain new social security numbers and identifications for Hispanic employees.  (Compl. ¶¶ 14(i)-(j).)  Eldorado disputes these claims.  (*See* SUF ¶¶ 222-79.)  The Plaintiffs have pointed to no evidence supporting such allegations.

McCauley alleges that on several occasions, Eldorado received "mismatch" letters from the Social Security Administration indicating there was a problem with an employee's social security number, and that she was then told to instruct the employee to address the problem.  (McCauley Dep. at 216-17.)  Stinebaugh also testified that he was aware of a few times when "Social Security numbers were

wrong [and] had to be fixed."  (Stinebaugh Dep. at 78-79.)  Eldorado

acknowledges that it receives no-match letters, provides the affected employee

with this information, and checks its records regarding the employee.  (SUF ¶¶

236-39.)

The fact that Eldorado, like numerous other employers, receives no-match

letters does not support the allegation that Eldorado helps employees obtain

fraudulent social security numbers or identification.  *See AFL-CIO v. Chertoff*, ---

F. Supp. 2d ---, C.A. No. 07-4472, 2007 WL 2972952, at *1 & n.1  (N.D. Cal. Oct.

10, 2007) (noting that no-match letters during relevant time period "emphasized

that receipt of the letter 'does not imply that you or your employee intentionally

gave the government wrong information about the employee's name or Social

Security number.  Nor does it make any statement about an employee's

immigration status.'" and noting that no-match letters provide three common

reasons for a mismatch: "(1) typographical errors made in spelling an employee's

name or listing the SSN; (2) failure of the employee to report a name change; and

(3) submission of a blank or incomplete Form W-2.")[10]; *Overview of Social*

---

[10] The Social Security Administration has amended its no-match letter to include a new "common reason" for a mismatch: "[t]he name or Social Security number reported is false, or the number was assigned to someone else."  *AFL-CIO*, 2007 WL 2972952, at *3.  Implementation of this amended no-match letter has been enjoined.  *Id.* at *15.  Even the amended letter, however, "informs employers that a no-match letter 'does not, *by itself*, make any statement about an employee's immigration status.'" *Id.* at *3.

*Security Employer No-Match Letters Process*, available at http://www.ssa.gov/ legislation/nomatch2.htm (stating "[t]here are a number of reasons why reported information may not agree with our records, such as typographical errors, unreported name changes, inaccurate or incomplete employer records or misuse of an SSN.").

McCauley could not identify any employee who was assisted in obtaining a fraudulent identification by Eldorado.  (McCauley Dep. at 223.)  McCauley stated that she saw "blatantly" false identification, although she did not know what form of identification it was.  (*Id.*)  When she brought this to her supervisor's attention, he would require the employee to provide other identification.  (*Id.* at 223-24.) McCauley was not involved at all in checking identification after Brisson came to Eldorado in 2003.  (SUF ¶ 235; McCauley Dep. at 224-25.)

Stinebaugh stated he knew that "Mexican Dave", a Hispanic employee, had fake identification and changed his name and social security number.  (Stinebaugh Dep. at 79-80.)  Stinebaugh testified, however, that he had no knowledge that Eldorado helped obtain the false identification or assisted "Mexican Dave" in any way.  (*Id.* at 80-81, 82.)

Hann testified that he had no knowledge regarding these allegations whatsoever.  (Hann Dep. at 33-34.)

Plaintiffs also rely on the testimony of another former employee, Eric Strine, who stated that he heard "a lot through talk" about undocumented workers at the company, but admitted he "d[i]dn't know that for a fact." Plaintiffs further rely on the fact that, at the time of their depositions, Samuel and Sibia Moreno were in custody on suspicion of being in the country illegally.

None of this unsubstantiated suspicion and subtly racist innuendo supports the Plaintiff's allegations that Eldorado allowed or assisted employees to obtain fraudulent social security numbers or identification. Under the standard of review governing motions for summary judgment, the Plaintiffs bear the burden of proffering evidence of record, beyond mere speculation, to support these allegations. *See, e.g.*, *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir.2005) ("Speculation does not create a genuine issue of material fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."); *Jones*, 214 F.3d at 407 ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial."); *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) ("[C]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment."). The

18

Plaintiffs here have not met this burden, and the Court must therefore disregard such allegations, which are wholly unsupported.[11]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson*, 477 U.S. at 248-49.

In opposing summary judgment, the non-moving party "may not rest upon the mere allegations or denials of the ... pleadings, but ... must set forth specific

---

[11] Moreover, as Eldorado notes, it is questionable how such allegations are material to the Plaintiff's claims of disparate treatment. Certainly the Plaintiffs do not mean to contend that they too should have received the "benefit" of company assistance in obtaining fraudulent social security numbers and identification.

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones*, 214 F.3d at 407.  Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).  However, the facts and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact-finder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

## III.   DISCUSSION

Title VII and the PHRA make it illegal for an employer to discriminate against an individual on the basis of race or national origin.[12]  42 U.S.C. § 2000e-2(a); 43 Pa. Cons. Stat. § 955(a).  A violation of this prohibition can be shown in two ways.  *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 346 (3d Cir. 1990).  First, under the disparate impact theory of discrimination, a violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer.  *Id.*  No proof of intentional discrimination is necessary.  *Id.* at 346-47.  Alternatively, under the disparate treatment theory of discrimination, a violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII.  *Id.* at 347.  Unlike the disparate impact theory, proof of the employer's discriminatory motive is critical under this analysis.  *Id.*  This case presents an alleged disparate treatment violation.

---

[12] "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005). Because the PHRA provisions at issue contain no such language, the Court will interpret the implicated provisions of Title VII and the PHRA under the same standards and caselaw.

The discriminatory intent necessary to establish a disparate treatment violation can either be shown by either direct evidence or through indirect or circumstantial evidence. *Id.* Here, as in most Title VII cases, the Plaintiffs rely on indirect evidence. *See Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999) ("The Supreme Court has recognized that an employer who discriminates will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent.").

The "typical" Title VII case is governed by the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (i) that he belongs to a protected class; (ii) that he was qualified for a job held or sought; (iii) that, despite his qualifications, he was discharged or rejected; and (iv) that non-members of the protected class were treated more favorably. *See id.* at 802. If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *Id.* If the employer does so, the burden shifts back to the plaintiff, who must show that the employer's explanation is pretextual. *Id.* at 804.

22

In a so-called "reverse discrimination" case such as this one, where the plaintiff is not a member of a protected class, a slightly modified analysis applies, as set forth in *Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999).  Under this analysis, "a plaintiff who brings a 'reverse discrimination' suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of his race, color, religion, sex, or national origin."  *Id.* at 163.  The second and third steps of the *McDonnell Douglas* framework remain the same.  *See id.* at 165-66.

## A.  Prima Facie Case

To make out a prima facie case of discrimination, the Plaintiffs must present sufficient evidence to allow a reasonable factfinder to conclude that Eldorado treated them less favorably than others because of their national origin.  *Id.* at 163.  "There is a low bar for establishing a prima facie case of employment discrimination."  *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 (3d. Cir. 2006) (citations omitted); *see also Ezold v. Wolf, Block, Schorr & Solis- Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) (stating "the prima facie case is easily made out").

Eldorado concedes that the Plaintiffs are non-Hispanics, were qualified for their positions, and that they were discharged.  (Def.'s Brs., Doc. 31 at 18, Doc. 33 at 13-14, Doc. 35 at 17.)  The Plaintiffs have proffered at least some evidence that Hispanic employees were retained after they were terminated; that Hispanic employees, at least temporarily, performed some of their former duties; that some meetings were conducted in Spanish; that Hispanics were provided training which was denied to McCauley; and that Hispanic applicants referred to the company by other employees were hired while non-Hispanic applicants referred by the Plaintiffs were not.  This evidence is sufficient to meet the Plaintiff's minimal burden of establishing a prima facie case.

## B.    Legitimate, Nondiscriminatory Reason

Because the Plaintiffs have made out a prima facie case of discrimination, the burden shifts to Eldorado to articulate "some legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas*, 411 U.S. at 802.  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 142 (2000).  An employer satisfies this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's*

24

*Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 254, 256 (1981)).  The employer's burden is "relatively light." *Id.*  In this case, Eldorado has plainly met its burden of articulating legitimate, nondiscriminatory reasons for each of the alleged acts of discrimination.

Eldorado explains that the Plaintiffs were terminated because the North Plant closed and their positions, along with all others at the plant, were eliminated. The Plaintiffs' positions were terminated first because they were indirect labor positions not tied to production, and because their job responsibilities were being duplicated by employees at the South Plant.  Although some Hispanic employees performed some of the Plaintiffs' former job functions during the winding down of the North Plant, no employees, Hispanic or otherwise, have replaced the Plaintiffs because the North Plant is closed and production has ceased.  In addition, although some Hispanic employees were retained following the closure of the North Plant, the vast majority of the employees terminated because of the closure were Hispanic.

Eldorado further offers that, although some communication occurred only in

Spanish, this communication was solely among Spanish-speaking employees. All meetings which the Plaintiffs were required to attend were in English. Eldorado further explains that notices and job postings were posted in both English and Spanish.

As to the training denied to McCauley, Eldorado explains that forklift and fire extinguisher training were not relevant to McCauley's administrative position. Both Hispanic and non-Hispanic employees, whose job responsibilities called for such training, received it. As to McCauley's request for Spanish classes, even McCauley admits that her job responsibilities did not require her to speak Spanish. (McCauley Dep. at 134.) McCauley claims she was denied classes because they were too expensive (McCauley Dep. at 136), but this is a legitimate, non-discriminatory reason for such a denial.

Finally, as to Eldorado's alleged discrimination in hiring, the Court first notes that allegations that Eldorado did not hire *someone else* do not support the Plaintiff's claims that Eldorado discriminated against *them*. Basic principles of standing hold that the Plaintiffs may seek redress under Title VII for injuries done to them, but may not seek redress for injuries done to others. *See Drake v. Steamfitters Local Union No. 420*, C.A. No. 01-6968, 2005 WL 196444 at *9 & n.11 (E.D. Pa. Jan. 27, 2005); *Jones v. United Gas Improvement Corp.*, 383 F.

Supp. 420, 432-34 (E.D. Pa. 1975).  Regardless, however, Eldorado has proffered

evidence that it employs, interviews, and hires both Hispanics and non-Hispanics.

### C.    Pretext

Because Eldorado has articulated legitimate, nondiscriminatory reasons for

its actions, the burden shifts back to the Plaintiffs to show that Eldorado's

explanations are pretextual.  *McDonnell Douglas*, 411 U.S. at 804.  The Plaintiffs

"must point to some evidence, direct or circumstantial, from which a factfinder

could reasonably either (1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than

not a motivating or determinative cause of the employer's action." *Fuentes*, 32

F.3d at 764.  "[T]o avoid summary judgment, the plaintiffs['] evidence rebutting

the employer's proffered legitimate reasons must allow a factfinder reasonably to

infer that each of the employer's proffered non-discriminatory reasons, was either a

post hoc fabrication or otherwise did not actually motivate the employment

action." *Id.*  It is not enough for the Plaintiffs to show that Eldorado's decisions

were wrong, mistaken, or unwise.  *Id.* at 765.  "Rather, the non-moving plaintiff[s]

must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of

credence, and hence infer that the employer did not act for the asserted

non-discriminatory reasons." *Id.* "[T]his standard places a difficult burden on the

plaintiff[s]." *Id.*    The Plaintiffs offer a grab-bag of assertions as to why

Eldorado's articulated legitimate, nondiscriminatory reasons are pretext, but none

of these assertions would cause a reasonable factfinder to disbelieve Eldorado's

explanations or infer that Eldorado acted with discriminatory motivation.

First, the Plaintiffs seem to argue that the North Plant did not, in fact, close.

This contention is preposterous given the Plaintiffs' own testimony that production

no longer takes place at the North Plant.  (Stinebaugh Dep. at 53, 55-56; McCauley

Dep. at 173; Hann Dep. at 24).  Moreover, the evidence cited by the Plaintiffs does

not support their argument.  Plaintiffs claim that Eldorado's justification of plant

closure should be disbelieved because Eldorado did not produce a written

document announcing the decision to close the North Plant and because Coughlin

could not recall precisely when such a decision was made.  The deposition

testimony of Eldorado personnel involved in the decision to close the plant,

however, consistently and indisputably supports the fact that Eldorado

management at the national and local level determined that a reduction in labor

costs was necessary and that the North Plant would be closed to effect this

reduction.  This sworn testimony is more than enough to demonstrate the North

Plant's closure, especially given the Plaintiffs' own admission that the plant is, in fact, closed.

The Plaintiffs argue that a few employees still work at the North Plant, but Eldorado concedes that the facility is still used for storing and drying stone and that some delivery and maintenance work is still performed there.  These facts in no way suggest that the North Plant remains open.  It is undisputed that production no longer takes place at the North Plant and that no one performs the Plaintiffs' former job responsibilities at the North Plant.

The Plaintiffs also note that headcounts at both Greencastle facilities and the North Plant itself occasionally increased after their termination.  However, the increases that the Plaintiffs point to, particularly at the North Plant, are very small.  (*See* Pls.' Ex. BX94; Brisson Dep. at 123.)  Further, the Plaintiffs' own exhibit shows that headcount at the North Plant went from 82 in January 2006 to 0 in September 2006.  (Pls.' Ex. BX94.)  Moreover, Eldorado convincingly explained that apparent increases in headcount at the North Plant were caused by the fact that employees from the South Plant were temporarily re-assigned to the North Plant to wind down the plant and learn the production process.  (Brisson Dep. at 27-28.)

As evidence that Eldorado did not really intend to close the North Plant, the Plaintiffs also point to an Eldorado memo from September 30, 2005, written in

anticipation of Coughlin's promotion to manager, which states that employees could expect to see an increase in workload.  This memo, however, is entirely consistent with the intention to close the plant.  Labor costs – the fact that so many employees worked so many hours – was the impetus for the closure.  In addition, Eldorado employees could logically expect an increased workload after the North Plant closed, as fewer employees would be tasked with performing the same production.

The Plaintiffs also argue that Eldorado did not intend to close the plant because employees were not aware of the closure before it happened.  Eldorado has explained that employees were not told of the plant closure to avoid a premature and mass exodus of employees.  (SUF ¶ 130; Coughlin Dep. at 61-62; Brisson Dep. at 29.)  The Plaintiffs attempt to cast doubt on this justification by pointing to the testimony of one human resources representative who stated she "guessed" that employees were told about the plant closure when they were terminated.  (*See* Zacour Dep. at 24.)  Not only is this statement contradicted by every other Eldorado employee's testimony, it is also contradicted by the Plaintiffs' own testimony that upon termination Eldorado informed them only that their positions were being eliminated or that they were being "laid off."  This inconsistent statement raises no doubt about Eldorado's intention to close the North Plant.

Similarly, the Plaintiffs point to the fact that WARN notices were not given to North Plant employees prior to the plant's closure.  Eldorado correctly points out, however, that the WARN Act is inapplicable to the closure of the North Plant because the closure did not result in the employment loss of 50 or more employees during any 30-day period.  *See* 29 U.S.C. §§ 2101, 2102.

The Plaintiffs also argue that Eldorado's plant closure explanation should be disbelieved because in a July 2006 EEOC position statement, Eldorado stated that the Plaintiffs' were terminated "as a result of production down time."  This statement was prepared before the final closure of the North Plant, and as indicated above, Eldorado chose not to publicize the closure to employees.  More importantly, however, Eldorado's position statement makes explicitly clear that the Plaintiffs were terminated because of position elimination and that no employees had replaced the Plaintiffs.  (*See* EEOC RFI at 2, 3.)  The EEOC statement, in fact, supports Eldorado's nondiscriminatory reasons.

The Plaintiffs also attempt to cast doubt on Eldorado's explanation that the Plaintiffs were included in the first phase of terminations because they held administrative and indirect labor positions.  Despite overwhelming testimony to the contrary, including her own,  McCauley argues in this instance that she did not hold an administrative position, but rather a "warehouse" position that should not

have been affected by the first phase of terminations.  This argument is simply

untenable in the face of the consistent and undisputed testimony that McCauley

performed only office and administrative functions.  Stinebaugh and Hann note

that they were promoted to indirect labor positions only a short time before their

terminations, and suggest that these promotions were a ruse used to terminate them

based on their race and national origin.  The Plaintiffs' have presented no evidence

to support the speculation that their promotions were motivated by improper

considerations, and certainly do not argue that their promotions were undeserved.

Further, even if Stinebaugh and Hann had remained in their direct labor positions,

it is undisputed that the North Plant is closed and that no positions – direct or

indirect – remain at the plant.  The implication of the Plaintiffs' argument is that

Eldorado closed an entire production facility solely for the purpose of terminating

three non-Hispanic employees.  No reasonable factfinder could accept this

contention.

The Plaintiffs also note that Eldorado employs a disproportionately large

number of Hispanics given the small number of Hispanics that reside in the

Greencastle area, and argue that this disparity "is so great that it could not be mere

coincidence."  The Plaintiffs, however, present no evidence disputing the fact that

the vast majority of employees terminated because of the closure of the North Plant

and the company's downsizing were Hispanic.  (Brisson Dep. at 26-27; Coughlin Dep. at 19-20.)  Nor do the Plaintiffs contest that Eldorado's management and many of its supervisors are non-Hispanic.  (SUF ¶¶ 66, 179, 209; Coughlin Dep. at 11-12, 92-94; Brisson Dep. at 26; Strine Dep. at 45; Cortes Dep. at 81.)  In the circumstances of this case, the mere fact that Eldorado employs a large number of Hispanics would not lead a reasonable factfinder to conclude that a discriminatory reason was more likely than not a motivating or determinative cause of the Plaintiffs' terminations.

Finally, the Plaintiffs attempt to attribute discriminatory intent to Eldorado by removing from context a few seemingly inflammatory quotes from the 19 depositions that they conducted.  The Plaintiffs rely principally on two quotes, neither of which actually support the Plaintiffs' claims.  First, the Plaintiffs cite to Coughlin's response to the question of why such a large percentage of Eldorado's workforce was Hispanic given the relatively small number of Hispanic residents in the Greencastle area.  Coughlin responded:

> They tell me that *years ago* they, because of the nature of
> the work, they could not find enough local residents in
> Greencastle to staff the plants.   So *the previous
> administration* went to Chambersburg and put notices up
> and solicited the people in Chambersburg to work there.

(Coughlin Dep. at 88-89 [emphasis added].)  As an initial matter, this innocuous

statement, even when read out of context as the Plaintiffs have presented it, does

not imply that Eldorado discriminated against non-Hispanics.  Further, as the

emphasized portions of the quote indicate, Coughlin's statement referred to the

discontinued practices of prior management.  Plaintiffs' counsel immediately

follow-up by asking Coughlin, "has Eldorado continued that practice?"  (Coughlin

Dep. at 89.)  To which Coughlin replied, "No."  (*Id.*)  Plaintiffs' counsel then asked

"[d]oes Eldorado seek Hispanic workers as opposed to Caucasian?"  (*Id.*)

Coughlin responded, "Absolutely not."  (*Id.*)

The Plaintiffs also rely on a statement from Bruce Jacobs, the former North

Plant manager who was fired by Eldorado in 2004.  In his deposition, Jacobs was

asked how Eldorado came to hire so many Hispanic workers.  (Jacobs Dep. at 23.)

The Plaintiffs state that Jacobs responded "You would find that most white people

just wouldn't work for the money that – or work that hard for the money."  In fact,

however, Jacobs' full response was:

> When I was there, the honest problem was *you would*
> *interview multiple candidates but – and you would hire*
> *both ethnic groups*, and you would find that most white
> people just wouldn't work for the money that – or work that
> hard for the money.   They figured they could go
> somewhere else and work.  And most Hispanics were fine
> with that.

(*Id.* at 23-24.)  This response confirms Eldorado's claims that it considers and hires

Hispanic and non-Hispanic applicants equally.  The Plaintiffs' misleading citation

to these partial quotes does not cast any doubt on Eldorado's legitimate and

nondiscriminatory reasons for its actions, and, in fact, merely highlights the

paucity of evidence of pretext presented by the Plaintiffs.

The Plaintiffs have not met their burden of proffering evidence from which a

factfinder reasonably could find that Eldorado's legitimate, non-discriminatory

reasons did not actually motivate its employment actions.  Therefore, Eldorado's

motions for summary judgment will be granted.

## IV.    CONCLUSION

Notwithstanding the unnecessarily voluminous record and the parties'

serpentine arguments, the conclusion in this case is relatively simple: Eldorado

closed a plant and eliminated the jobs there.  The Plaintiffs were terminated

because of this economic decision, not on any basis prohibited by Title VII or the

PHRA.  An appropriate order shall issue granting Eldorado summary judgment.